NOTICE:  All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports.  If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

SJC-13783

COMMONWEALTH  vs.  STEPHEN PINA.

Suffolk.     March 4, 2026. - July 28, 2026.

Present:  Budd, C.J., Gaziano, Kafker, Wendlandt, Georges, Dewar, & Wolohojian, JJ.

Homicide.  Firearms.  Evidence, Exculpatory, Impeachment of credibility, Identification, Disclosure of evidence, Police report, Third-party culprit.  Practice, Criminal, Witness, Disclosure of evidence, Waiver, New trial.  Witness, Credibility, Impeachment.  Mental Health.  Identification. Deoxyribonucleic Acid.  Waiver.


Indictments found and returned in the Superior Court Department on October 27, 1993.

Following review by this court, 430 Mass. 266 (1999), a motion for a new trial, filed on November 18, 2020, was heard by Peter B. Krupp, J.

A request for leave to appeal was allowed by Gaziano, J., in the Supreme Judicial Court for the county of Suffolk.


Ian MacLean, Assistant District Attorney, for the Commonwealth.
Jill A. Tessier (Lisa M. Kavanaugh also present) for the defendant.
Radha Natarajan & Katharine Naples-Mitchell, for New England Innocence Project & another, amici curiae, submitted a brief.

GAZIANO, J.   A Superior Court jury convicted the defendant of unlawful possession of a firearm and murder in the first degree on a theory of deliberate premeditation for the killing of Keith Robinson (victim or shooting victim) on February 26, 1993.   There was no physical evidence presented at trial tying the defendant to the shooting.   Rather, the Commonwealth primarily relied on the testimony of two eyewitnesses, Debra Annas[1] and Timothy Hall, who said that they observed the defendant shoot the victim.   At all times, the defendant has advanced a defense based on misidentification.

In Commonwealth v. Pina, 430 Mass. 266, 275 (1999) (Pina I), we affirmed the defendant's convictions and declined to grant the defendant relief under G. L. c. 278, § 33E.   The defendant has since filed three motions for a new trial.   After the first two motions were denied, the defendant filed the present motion in November 2020.

In his third motion, the defendant argued that he was entitled to a new trial because, among other reasons, (1) evidence that Annas was psychiatrically hospitalized at the time of her testimony constituted either newly discovered or

---

[1] Annas is referred to in various places in the record as "Deborah Rocher," "Debra Rocher," "Debra Annas," "Deborah Rocher Annas," and "Deborah Annas."   In Commonwealth v. Pina, 430 Mass. 266, 267 (1999), we referred to her as "Debra Rocher Annas." Here, we refer to her as the motion judge did:   Debra Annas.

nondisclosed evidence that would have allowed the defendant to challenge her credibility and the reliability of her identification; (2) police reports that potentially implicated a third party in the shooting constituted either newly discovered or nondisclosed evidence that would have allowed the defendant to make a strong third-party culprit defense; and (3) newly available deoxyribonucleic acid (DNA) evidence from the murder weapon and from the victim's jacket excluded the defendant as a contributor.

A Superior Court judge (motion judge) concluded that, given the totality of the nondisclosed, newly discovered, and newly available evidence, "justice may not have been done," Mass. R. Crim. P. 30 (b), as appearing in 435 Mass. 1501 (2001) (rule 30 [b]). Accordingly, the motion judge granted the defendant's motion for a new trial.

The matter is now before us on the Commonwealth's appeal from the motion judge's decision, after a single justice of the county court allowed the Commonwealth's application for leave to appeal. Discerning no error of law or abuse of discretion by the motion judge, we affirm the allowance of the defendant's motion for a new trial.[2]

---

[2] We acknowledge the amicus brief submitted by the New England Innocence Project and the Criminal Justice Institute at Harvard Law School in support of the defendant.

1.  Background.  Pina I, 430 Mass. at 267-269, presented the facts underlying the defendant's convictions.  On February 26, 1993, the victim was shot while selling drugs on Horadan Way in the Mission Hill section of Boston.  The shooter fled in the direction of McGreevy Way, where police officers later retrieved a revolver from a snowbank.  The Commonwealth did not present any forensic, video, or photographic evidence tying the defendant to the shooting.  However, two eyewitnesses -- Hall and Annas -- both identified the defendant as the shooter.

We focus our remaining discussion of the background on the specific facts relevant to the issues in this appeal, which we draw from certain trial evidence, the motion judge's factual findings, and additional details from the record that are consistent with the judge's findings and determinations of credibility.  See Commonwealth v. Gaines, 494 Mass. 525, 532 (2024); Commonwealth v. Lessieur, 488 Mass. 620, 621 (2021).  We reserve further details for our discussion below.

a.  Trial testimony.  i.  Timothy Hall.  According to Hall's trial testimony, on February 26, 1993, at around 7:30 or 8 P.M., Hall traveled to Horadan Way to purchase heroin from the victim.  While he was negotiating with the victim to buy the drugs, a "lighter complexioned, heavy-set" man who was "about [Hall's] height" started walking toward him and the victim at a "moderate" pace.  As the man approached, Hall could hear him

singing "[s]omething like . . . [g]ive me your shit or I'll bust you with my click." The man grabbed the victim "[b]y either his collar or his lapel" and "started shooting." Hall heard "[a]t least four shots." As the victim fell backwards, the man continued firing. Hall testified that he was looking directly at the shooter while he was firing the gun and was so close to the man that he "could have touched him." The shooter then ran in the direction of McGreevy Way. At that point, Hall estimated that about twenty seconds had elapsed from the time he first saw the shooter.

An officer who spoke with Hall within ten minutes of the shooting testified that Hall described the shooter as "a [B]lack male approximately five [feet,] nine [inches], between the ages of twenty-three and twenty-six, weighing . . . a hundred and sixty [to] a hundred and eighty pounds, wearing a black knit hat, a red . . . winter waist-length jacket, dark pants and dark shoes."[3]

Hall was then taken to a police station in the Roxbury section of Boston. He testified that the police showed him a

---

[3] As mentioned, Hall testified at trial that the shooter was a "lighter complexioned, heavy-set" man. In an interview with a homicide detective that occurred less than two hours after the shooting, Hall described the shooter as a "possibly [B]lack male" with "light skin" and a "husky build," standing five feet, nine inches tall, and wearing a "down fill style" red ski parka, along with a black wool knit hat.

photographic array containing from sixteen to twenty photographs.[4] Hall identified a photograph of the defendant as the shooter but told police that he "was maybe about sixty percent sure."[5] At trial, Hall made an in-court identification of the defendant as the shooter.

ii. Debra Annas. At trial, Annas testified that she had known the defendant for "[m]aybe a year and a half, [or] two years" prior to the shooting. The defendant lived across from her on Horadan Way in the Mission Hill housing development. Annas claimed that she had been purchasing drugs from him for "[a] couple of months" before the shooting, including "[e]very night" in February 1993.

On the evening of February 26, 1993, Annas went to 31 Horadan Way to purchase drugs. Outside of that address was a crowd of fifteen to twenty-five people, including the victim. Annas asked the victim for drugs, but he did not have the type she wanted. According to Annas, she was standing on the street corner of 31 Horadan Way when, at about 9 P.M., she saw a "maroonish color car" pull up "really fast," and the driver

---

[4] A police officer testified that the photographic array consisted of eight photographs.

[5] At trial, Hall testified that at the time of the identification he was actually "a hundred percent certain" but did not say so because he was "starting to have second thoughts and just didn't want to get involved all of a sudden."

"slammed on the brakes." She testified that three individuals occupied the car, with the defendant seated in one of the passenger seats. Annas witnessed the defendant, who was dressed in "dark clothing" and appeared "very angry," get out of the car and approach the victim "really fast," at which point "they started to argue." As the two argued, Annas stood nearby and, according to her trial testimony, had no problem viewing the defendant's face. She heard the defendant make comments about drugs, a ring, money, and "business," although she "wasn't listening to the whole thing."

Annas testified that she then saw the defendant return to the car and retrieve a gun from between the seats. He then "very heavily walked really fast" toward the victim while singing a rap song. Annas saw "a flash" from the gun and heard "[a] few" shots. She testified that she witnessed the defendant "shoot [the victim] in the eye." She then saw the defendant run toward McGreevy Way.

Annas did not report what she witnessed to the police the night of the murder because "you don't run to the police in the projects." While Annas could not recall the exact date when she first spoke with law enforcement regarding the murder, she testified that she initially discussed what she saw with police "several months" later, after an unrelated killing of one of her friends. Detective John McCarthy of the Boston police

department testified that he showed Annas eight photographs on April 18, 1993, including one of the defendant, but she did not identify any of the individuals in the photographs as the shooter.[6]  It was not until Annas was shown a second photographic array in September, over six months after the murder, that she identified the defendant as "[t]he person that shot [the victim]."  Annas testified that, prior to viewing one of the photographic arrays, she was taken out of a "base house" -- a place "where everybody goes to smoke cocaine" -- and was high on "crack" cocaine when viewing the photographs.  She could not recall whether this happened prior to viewing the first or second photographic array.

iii.  <u>Officers Yvonne Moschella and James O'Loughlin</u>.  On cross-examination of two Boston Housing Authority police officers -- Yvonne Moschella and James O'Loughlin -- defense counsel attempted to connect the shooting victim to a robbery that occurred earlier on the day of the shooting.  According to Moschella and O'Loughlin, at approximately 5 P.M. on February 26, 1993 -- several hours before the victim was shot -- the officers observed two men walking on Annunciation Road, which is a few blocks away from Horadan Way.  One of the men, who was

--------

[6] Annas testified that when she was shown the first photographic array, she told detectives that she recognized the picture of the defendant and "was thinking that they would just put two and two together, but they didn't."

bleeding from the head, told the officers that he had been robbed. Moschella's report of the incident stated that the individual was "bleeding profusely from a wound to his right eye area." Although the officers asked the man his name, he refused to provide it or "cooperate in anyway whatsoever." When asked if he wanted to pursue the matter in court, the man responded, "No, I'll take care of it myself."

The individual did, however, point out the man who allegedly committed the robbery. Both officers testified that they observed the alleged robber entering an apartment further down Annunciation Road. Moschella, who could see the alleged robber's face, estimated that he was twenty yards away. O'Loughlin, on the other hand, could not see the alleged robber's face and believed he was one hundred yards away. Both officers testified that the alleged robber was a Black male with a medium complexion, standing approximately five feet, ten inches tall, weighing about 170 pounds, and wearing a red jacket. Moschella added that the alleged robber had "cropped hair."

The description of the Annunciation Road robber was consistent with that of the shooting victim. At trial, Moschella and O'Loughlin, who had responded to the scene of the shooting after hearing gunshots, described the shooting victim as a Black male with a medium complexion, standing approximately

five feet, ten inches tall, weighing 160 to 170 pounds, with cropped hair, and wearing a red jacket. Following the shooting, O'Loughlin wrote a report in which he stated that he believed the shooting victim was also the alleged robber from earlier in the day on Annunciation Road. However, Moschella testified that she had never seen the alleged robber before and was "positive" that the alleged robber was not the same person as the shooting victim, whom she had met in early February of 1993.

The officers also provided descriptions of the bleeding man and the other man with him. The bleeding man was a "medium-skinned," "thin [B]lack male," standing six feet, one inch tall. Additionally, the officers estimated he was from twenty-three to twenty-five years old. The other man was an approximately twenty year old Black male, standing about five feet, nine inches tall, with "medium skin" and "more of a medium build." This other man was "wearing a black knit cap, black pants, and a black jacket."

iv. The murder weapon. At trial, defense counsel sought to elicit on cross-examination of McCarthy that a man named Brian Johnson had stolen the revolver used in the murder from his father prior to the murder, that Johnson had it with him sometime in late February of 1993, and that a friend of Johnson had access to the gun. In support of this line of questioning, at sidebar, defense counsel read into the record excerpts of

interviews that police conducted with Johnson and his father. Nonetheless, the trial judge declined to allow this line of questioning because the implication of Johnson's involvement in the murder was speculative.

b.  Newly discovered and available evidence.  i.  Annas's psychiatric hospitalization.  Unbeknownst to the defense, on October 26, 1995, Annas was admitted to Taunton State Hospital, a psychiatric hospital, pursuant to G. L. c. 123, § 18 (a), after attempting suicide at the Massachusetts Correctional Institution, Framingham (MCI-Framingham), and refusing to eat or drink.[7]  A psychiatric evaluation from January 31, 1996, revealed that she had previously been admitted to nine other medical or mental health facilities for psychiatric hospitalizations.  In one such instance, Annas voluntarily admitted herself to a mental health center, where, in January 1995, she was found to have a positive toxicology screen for opiates and cocaine, was assessed to be depressed, and complained of vague suicidal ideation.  She was diagnosed, both at the time of her January

---

[7] General Laws c. 123, § 18 (a), provides that a person confined in a place of detention may be transferred to a mental health facility if there is reason to believe she is in need of hospitalization because of mental illness.  Annas was committed to MCI-Framingham in June 1995 for violating the terms of her probation, which had been imposed as part of her sentence for pleading guilty to larceny.  While Annas testified that she was "incarcerated" at the time of the defendant's trial, the jury never learned that she was psychiatrically hospitalized.

1996 evaluation and at the time of her admission one year prior, as suffering from a mixed personality disorder with borderline and antisocial features.  A treatment plan in her medical records revealed that she similarly had been diagnosed with antisocial and borderline personality disorder.  Her January 1996 psychiatric evaluation also revealed that she had "a long history of polysubstance abuse, including heroin, cocaine, alcohol, and marijuana."

On January 10, 1996, the Commonwealth procured a writ of habeas corpus from the Superior Court to the superintendent of the Taunton State Hospital to compel Annas's appearance at the defendant's trial.  She was transported from the hospital and testified at the trial on January 17, 1996.  The prosecutor's file contained a note from McCarthy containing the name and telephone number of Annas's psychologist at Taunton State Hospital.  However, the Commonwealth did not disclose Annas's psychiatric hospitalization to the defense.  More than a decade after his convictions, the defendant discovered, with help from investigative journalists, that Annas was psychiatrically hospitalized when she testified at the defendant's 1996 trial.

At an evidentiary hearing on the defendant's present motion for a new trial, two defense experts testified regarding Annas's mental health conditions.  First, Dr. Nancy Franklin -- a cognitive scientist specializing in human information processing

-- testified that Annas's diagnoses are significant to consider when assessing the risk of misidentification in this case. Second, Dr. Emily Clionsky -- an internist and psychiatrist who has published about cognition -- similarly testified that, based on a review of Annas's medical records, Annas could not have been a reliable eyewitness. In response, the Commonwealth's expert, Dr. David Kroll -- a psychiatrist who is board certified in general adult psychiatry, consultation liaison psychiatry, and addiction medicine -- testified that nothing in Annas's medical records points to a major impairment in memory, and disagreed with Clionsky's conclusion that Annas could not reliably or accurately make an identification of the shooter.

ii. <u>Third-party culprit evidence</u>. Years after his convictions, the defendant obtained police reports pursuant to public records requests. These newly discovered police reports revealed that on the night of the murder, three men committed an armed carjacking of a Nissan Maxima "a couple miles away" from the location of the shooting. The stolen vehicle, a maroon four-door sedan, generally matched the description of the car that Annas said was involved in the shooting. The owner of the stolen Nissan told police that he was forced out of the car at gunpoint.

Two weeks later, the police located the Nissan while investigating another crime. After stopping the vehicle, the

officers found two occupants inside:  Brian Johnson and Anthony
Woods.  Police described Johnson as a twenty-four year old Black
male, standing five feet, nine inches tall and weighing 140
pounds, with a slim build, a light complexion, and a scar on the
right side of his forehead.  Johnson's booking photograph from
that arrest reveals a healing scar over his right eye, which the
motion judge found was consistent with the head injury that
officers saw on the bleeding man who was robbed on Annunciation
Road on the night of the victim's murder.  Police described
Woods as a twenty-two year old Black male, standing five feet,
eleven inches tall and weighing 250 pounds, with a heavy build
and a medium complexion.  The motion judge noted, "Woods'[s]
physical description is similar to the description of [the
victim's] shooter,[8] and his booking photograph bears a fairly
close resemblance to [the] defendant."

     iii.  DNA results.  Following the allowance of the
defendant's motion for postconviction forensic testing pursuant
to G. L. c. 278A, in 2015, a private laboratory performed DNA
testing -- not available at the time of trial -- on swabs taken

_____

     [8] As noted supra, the shooter was variously described as
"weighing . . . a hundred and sixty [to] a hundred and eighty
pounds," "heavy-set," and "husky."  Given these inconsistencies,
we do not rely on the motion judge's finding that "Woods'[s]
physical description is similar to the description of [the
victim's] shooter," where Woods was described by police as
weighing 250 pounds.

from the lapel and hood area of the victim's red jacket, as well as swabs taken from the murder weapon.  The test results for the swabs from the murder weapon were inconclusive.  However, testing of the swabs taken from the victim's jacket -- which, according to Hall's testimony, the shooter had grabbed -- revealed a major DNA profile consistent with that of the victim, while the defendant was excluded as a major contributor.  There were insufficient amounts of DNA detected from the minor contributor to draw any conclusions.

In 2018, the defendant sent the 2015 DNA data to a DNA analysis firm for analysis using a different testing software. The firm's report supported the defendant's exclusion as a contributor to the DNA samples recovered from the grip, cylinder, and barrel of the murder weapon; the inner side of the jacket's right lapel; the outer side of the jacket's left lapel; and the lower area of the jacket's hood.

c.  <u>Procedural history</u>.  On October 27, 1993, the defendant was indicted on one count of murder, in violation of G. L. c. 265, § 1, and one count of unlawful possession of a firearm, in violation of G. L. c. 269, § 10 (<u>a</u>).  The defendant's first trial in 1995 resulted in a mistrial after the jury were unable to reach a verdict.

At the defendant's second trial in January 1996, the defendant was convicted of murder in the first degree on a

theory of deliberate premeditation and unlawful possession of a firearm. He was sentenced to the mandatory term of life in prison without the possibility of parole for the murder conviction and a concurrent term of from four and one-half to five years in State prison for the firearm conviction. In 1999, this court affirmed the defendant's convictions. See Pina I, 430 Mass. at 275.

Following his direct appeal, the defendant's first motion for a new trial, which he filed pro se in 1999, was denied without a hearing. His second motion for a new trial, filed in 2003, was also denied without a hearing. His petitions to appeal from the denials of his first and second motions for a new trial were denied in the county court.

In 2020, Pina filed the instant motion for a new trial. In 2022, the motion judge held an evidentiary hearing that spanned four days. On February 3, 2025, the motion judge issued a memorandum and order allowing the motion.[9] The Commonwealth

[9] In his motion for a new trial, the defendant also argued that research regarding the impact of various mental health disorders on the reliability of eyewitness identifications constituted newly available scientific evidence that raises questions about the eyewitness identifications in this case. The motion judge considered this evidence as one factor, acting in concert with the evidence discussed infra, to support his conclusion that justice may not have been done. See Commonwealth v. Rosario, 477 Mass. 69, 77-78 (2017). On appeal, the Commonwealth does not raise any arguments with respect to this issue. Accordingly, any such arguments are deemed to be

filed a timely notice of appeal and gatekeeper petition pursuant
to G. L. c. 278, § 33E.  On June 16, 2025, the single justice
allowed the Commonwealth to appeal to the full court.

2.  Discussion.  a.  Standard of review.  "[A] judge 'may
grant a new trial at any time if it appears that justice may not
have been done.'"  Commonwealth v. Brescia, 471 Mass. 381, 388
(2015), quoting Mass. R. Crim. P. 30 (b).  Such a decision is
"committed to the sound discretion of the judge."  Commonwealth
v. Scott, 467 Mass. 336, 344 (2014).  In applying the rule
30 (b) standard "rigorously," judges should grant a motion for a
new trial "only if the defendant comes forward with a credible
reason that outweighs the risk of prejudice to the Commonwealth"
(citation omitted).  Commonwealth v. Yat Fung Ng, 489 Mass. 242,
248 (2022), S.C., 491 Mass. 247 (2023).  Additionally, in "rare
cases," the judge may "look beyond the specific, individual
reasons for granting a new trial to consider how a number of
factors act in concert to cause a substantial risk of a
miscarriage of justice and therefore warrant the granting of a
new trial."  Commonwealth v. Rosario, 477 Mass. 69, 77-78
(2017).

"Where the Commonwealth appeals from the grant of a
defendant's motion for a new trial, we consider whether the

waived, and we do not address this issue.  See Mass. R. A. P.
16 (a) (9), as appearing in 481 Mass. 1628 (2019).

judge committed a significant error of law or abuse of discretion in allowing the defendant's motion." Commonwealth v. Drayton, 479 Mass. 479, 486 (2018). Abuse of discretion occurs where a judge makes "a clear error of judgment in weighing the factors relevant to the decision, such that the decision falls outside the range of reasonable alternatives" (quotation and citation omitted). L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014). "When, as here, the motion judge did not preside at trial, we defer to that judge's assessment of the credibility of witnesses at the hearing on the new trial motion, but we regard ourselves in as good a position as the motion judge to assess the trial record" (citation omitted). Drayton, supra. Moreover, we consider the record before us in its entirety to determine whether evidence exists supporting the judge's decision to grant a defendant's motion for a new trial. See Yat Fung Ng, 489 Mass. at 248.

b. Annas's hospitalization. The defendant argued in the present motion for a new trial that Annas's psychiatric hospitalization and treatment constituted both nondisclosed exculpatory evidence and newly discovered evidence. While the motion judge found that the Commonwealth violated its constitutional obligation to disclose exculpatory evidence, we analyze the information about Annas's hospitalization as newly

discovered evidence instead.[10]  See Commonwealth v. Bartlett, 465 Mass. 112, 117 (2013) ("We may affirm the ruling on any grounds supported by the record and the findings of fact").

In order to prevail on a motion for a new trial based on newly discovered evidence, "the defendant 'must establish both that the evidence is newly discovered and that it casts real doubt on the justice of the conviction.'"  Commonwealth v. Drayton, 473 Mass. 23, 31 (2015) (Drayton I), S.C., 479 Mass. 479 (2018), quoting Commonwealth v. Grace, 397 Mass. 303, 305 (1986).  To establish that evidence is newly discovered, the defendant must show that the evidence "was unknown to the defendant or trial counsel and not reasonably discoverable at the time of trial or at an earlier motion for a new trial" (quotation and citation omitted).  Commonwealth v. Ellis, 475 Mass. 459, 472 (2016).

---

[10] The Commonwealth does not dispute that the prosecutor was aware at the time of trial that Annas was psychiatrically hospitalized or that this information was not disclosed to the defendant.  However, as the Commonwealth points out, the motion judge did not apply the then-applicable discovery protocol to determine whether, if the defendant had known of Annas's hospitalization, he would have been able to obtain access to Annas's privileged treatment records at the time of trial.  See Commonwealth v. Bishop, 416 Mass. 169, 179-183 (1993), overruled in part by Commonwealth v. Dwyer, 448 Mass. 122, 139 (2006).  We decline to apply this protocol, which has since been replaced, see Dwyer, supra, in the first instance, or remand the case to the motion judge to apply it, where our analysis of the medical records as newly discovered evidence obviates any need to do so.

Here, the Commonwealth does not dispute on appeal that Annas's hospitalization and treatment qualify as newly discovered evidence. Indeed, as the motion judge found, the defense did not know that Annas was psychiatrically hospitalized at the time of trial. It was not until more than a decade after his convictions that the defendant discovered that Annas was psychiatrically hospitalized, and he did not discover her treatment records until 2021 -- long after both his trial in 1996 and his last motion for a new trial in 2003.

The question then becomes whether the newly discovered evidence casts real doubt on the justice of the convictions. See Drayton I, 473 Mass. at 31. In determining whether newly discovered evidence casts real doubt on the justice of the convictions, "[t]he inquiry is not whether the verdict[s] would have been different, but rather whether the new evidence would probably have been a real factor in the jury's deliberations" (quotation and citation omitted). Commonwealth v. Bateman, 497 Mass. 169, 183 (2026).[11]

---

[11] In determining whether the failure to disclose Annas's hospitalization prejudiced the defendant, the motion judge applied this same standard applicable to newly discovered evidence. See Commonwealth v. Barry, 481 Mass. 388, 399-400, cert. denied, 589 U.S. 941 (2019) (where no specific request for particular evidence is made, prejudice from nondisclosed evidence is determined using same standard as for newly discovered evidence). See also Commonwealth v. Caldwell, 487 Mass. 370, 377 (2021) (where no specific request is made, we

Here, the motion judge determined that the defendant could have used Annas's hospitalization and treatment as impeachment evidence at trial, reasoning that the defense "would have surely brought out the fact of [Annas's] hospitalization as a basis to attack her credibility."  The motion judge further reasoned that the treatment records "would have revealed Annas'[s] long history of mental health hospitalizations and diagnoses, including diagnoses which raise questions about the reliability of her eyewitness identification."

Although we have said that "[n]ewly discovered evidence that tends merely to impeach the credibility of a witness will not ordinarily be the basis of a new trial," Commonwealth v. Pope, 489 Mass. 790, 801 (2022), quoting Commonwealth v. Sullivan, 478 Mass. 369, 383 (2017), "[w]e have never adopted an inflexible rule that newly discovered evidence that merely . . . impeaches a witness's testimony is an insufficient basis for a motion for a new trial," Pope, supra at 802, quoting Commonwealth v. Cowels, 470 Mass. 607, 621 (2015).  Rather, we "consider[] the particularities of the scope and impact of that evidence and, importantly, the strength of the Commonwealth's case."  Pope, supra.

---

ask, "[W]ould it have been a real factor in the jury's deliberations?" [citation omitted]).

Annas's treatment records reveal multiple diagnoses, including borderline personality disorder, antisocial personality disorder, and mixed personality disorder with antisocial and borderline features.[12]  The motion judge explicitly credited the testimony and report of the defendant's expert, Franklin, who reviewed these records.  Franklin testified that borderline personality disorder can increase the risk of misidentification because individuals with this disorder are at a heightened risk of suggestibility and "respond very strongly in memory situations to emotional information," which can lead to a "detriment of processing of details."  She further noted that this increased risk of misidentification and greater suggestibility have been found even when individuals are euthymic, meaning when they are not manifesting active symptoms of borderline personality.

Given this evidence, the motion judge did not abuse his discretion in finding that the defendant could have used Annas's history of mental health hospitalizations and diagnoses to attack her credibility and the reliability of her eyewitness identification.  As we have long held, "mental impairment, as well as habitual intoxication and drug addiction, may be the

---

[12] Annas's treatment records were impounded.  "The impoundment is lifted as to the information in the opinion, to the extent necessary in resolving the case."  Commonwealth v. Gelin, 494 Mass. 777, 779 n.5 (2024).

subject of proper impeachment if it is shown that such factors affect the witness's capacity to perceive, remember, and articulate correctly."  Commonwealth v. Caine, 366 Mass. 366, 369 (1974).  See Commonwealth v. Figueroa, 413 Mass. 193, 203 (1992), S.C., 422 Mass. 72 (1996) (where witness is suffering from mental impairment, "evidence of how that impairment might affect her capacity to perceive, remember and articulate the alleged events . . . can be used to impeach the [witness's] credibility").  Given the evidence linking information contained in the treatment records to Annas's capacity to perceive, remember, and articulate the alleged events, the records hold impeachment value.

Nevertheless, the Commonwealth contends that given the strength of its case against the defendant, evidence of Annas's psychiatric hospitalization and treatment would not have been a real factor in the jury's deliberations.  Specifically, the Commonwealth points to a number of factors that it claims support Annas's identification of the defendant.  First, the Commonwealth emphasizes the fact that Annas knew the defendant for one and one-half to two years prior to the shooting and bought drugs from him every night in February 1993.  Next, it points out that Annas's descriptions of the incident and the shooter were generally consistent with those of Hall.  Finally, it notes that Annas's testimony at trial was consistent with the

information she provided to police around the time of the shooting and during the defendant's first trial, both of which preceded her admission to Taunton State Hospital.

None of these arguments convinces us that the motion judge abused his discretion.  First, Annas's familiarity with the defendant did not insulate her from misidentification.  Franklin testified,

> "[P]eople make about five times the number of misidentifications for someone who is only a casual acquaintance versus someone who is a member of one's family or one's best friend.  They make about five times the number of misidentifications for a next-door neighbor as compared with someone in one's family or one's best friend."

Next, while it is true that Annas's description of the incident and the shooter bore similarities to those of Hall, it is also true, as the motion judge noted, that "Hall's testimony differed materially from Annas's testimony in many regards."  The motion judge wrote:

> "Hall did not describe any involvement by a car, did not describe any type of argument, did not describe the shooter encountering [the victim] more than once, did not observe the shooter to approach [the victim] 'really fast,' and did not see the shooter in possession of a gun before the shooter grabbed [the victim] and removed an object from his (the shooter's) pocket."

The motion judge also noted various issues with Hall's identification, including his equivocal photographic identification of the defendant on the night of the shooting and inconsistency between Hall's testimony and an officer's

testimony regarding the number of photographs in the photographic array.

Additionally, although Annas had not yet been admitted to Taunton State Hospital at the time of the shooting or during the defendant's first trial, this does not necessarily mean that Annas did not suffer from her psychiatric conditions at the time of the shooting.  The motion judge noted, "Annas reported to the Taunton State Hospital that she had previously been admitted to no less than nine other medical or mental health facilities for psychiatric hospitalizations."  Among these prior hospitalizations, Annas was reportedly committed to a mental health center years prior to the shooting and admitted herself voluntarily to the same mental health center about two months before the defendant's first trial.

Lastly, and importantly, with respect to the strength of the Commonwealth's case, see Pope, 489 Mass. at 802, and the importance of Annas's testimony, the motion judge noted:

> "This is not a situation where there was a mountain of other evidence available to convict [the] defendant.  Annas was the key to the Commonwealth's case.  There was no forensic, video, photographic or other hard evidence linking [the] defendant to the shooting.  There was no evidence that [the] defendant knew [the victim] or had any motive to shoot [him].[13]  Undermining Annas'[s] credibility was crucial to the defense."

_____

[13] The Commonwealth contends that there was evidence the defendant knew the victim and had a motive to shoot him, pointing to our recitation of facts in Pina I, 430 Mass. at 268, where we mentioned a purported argument between the defendant

"[I]n rare cases, a new trial may be warranted '[w]here the Commonwealth's case depends so heavily on the testimony of a witness' and where the newly discovered evidence 'seriously undermines the credibility of that witness,'" Cowels, 470 Mass. at 621, quoting Commonwealth v. Liebman, 388 Mass. 483, 489 (1983).  Cf. Gaines, 494 Mass. at 542 ("The defendant's inability to challenge the credibility of a key witness who placed the defendant near the scene of the crimes on the day of the shooting raised a substantial risk that the jury would have reached a different conclusion if the evidence had been admitted at trial" [quotation and citation omitted]); Commonwealth v. Caldwell, 487 Mass. 370, 377 (2021) (evidence would have been real factor in jury's deliberations because it "would have provided the defendant with the strongest available basis for impeaching the credibility of [a] critical witness").

Here, there is no question that the Commonwealth's case depended heavily on Annas's testimony.  As for whether the treatment records so seriously undermine the credibility of Annas's testimony that they warrant a new trial, the

---

and the victim over "money, a ring, drugs, and 'business.'"  But the Commonwealth fails to mention that the witness who overheard the alleged argument was Annas -- the same witness whose reliability is in question.  Treating this as evidence that the defendant knew the victim and had a motive to shoot him presupposes that Annas correctly identified the defendant as the shooter.

Commonwealth emphasizes portions of the records that would suggest her psychiatric conditions did not affect her capacity to perceive or remember the alleged shooting. For example, in one report, a psychologist found that Annas had "no apparent immediate, delayed, recent, or remote impairments" to her memory, exhibited "normal" attention and concentration, lacked any disturbances in sensory perception, and was "fully oriented to time, place, person, situation, familiar objects, and other people."

We need not decide whether the treatment records are sufficient on their own to warrant a new trial. The motion judge treated this evidence as one of the "factors act[ing] in concert to cause a substantial risk of a miscarriage of justice." Rosario, 477 Mass. at 77-78. It was not an abuse of discretion for him to do so. That is, it was proper to consider the evidence relating to Annas's psychiatric hospitalization as part of the basis for ordering a new trial.

c. Third-party culprit evidence. Because the motion judge could not definitively determine whether the third-party culprit evidence concerning the carjacking on the night of the murder was known to the prosecution team, he analyzed the material as newly discovered evidence rather than evidence that the prosecution failed to disclose. In so doing, he found the third-party culprit evidence "would have supplied missing links

between Johnson, the Annunciation Road robbery, and [the victim's] shooting," which would have allowed the defendant to introduce evidence about the murder weapon that the judge ruled inadmissible at trial.

On appeal, the Commonwealth does not contest the motion judge's finding that the third-party culprit evidence was newly discovered. Instead, it contends that the motion judge erred in concluding that such evidence casts real doubt on the justice of the defendant's convictions because the shooting occurred prior to the carjacking and, as such, the shooter could not have used the stolen vehicle to arrive at the murder scene. We disagree.

To be sure, there does appear to be a discrepancy in timing when cross-referencing records concerning the stolen vehicle with evidence at trial concerning the shooting. According to a stolen vehicle report, the Nissan was stolen between 9:30 and 10 P.M. on February 26, 1993. Comparatively, the evidence at trial placed the shooting of the victim up to ninety minutes earlier that day -- between 8:30 and 9 P.M.

Certainly, this timing discrepancy may weaken a third-party culprit defense that Johnson, Woods, or the other occupant of the stolen Nissan was involved in the shooting. But it does not mean that the motion judge abused his discretion in concluding that the newly discovered evidence casts real doubt on the justice of the defendant's convictions -- particularly where the

motion judge addressed the timing issue. He found, "Given when, how, and by whom the car theft was reported, there are reasons to believe that the precise time that the Nissan was stolen is in question." The motion judge based this on the fact that the police had difficulty understanding the victim of the car theft[14] and on inconsistencies in the records related to the timing and other details of the theft.[15] Thus, the motion judge was not obligated to find, as the Commonwealth argues, that the theft must have occurred after the shooting.

Notwithstanding this conflicting evidence, the motion judge properly determined that the newly discovered evidence "probably

---

[14] The motion judge found that there was "some indication" that the carjacking victim "had some difficulty speaking English." The Commonwealth argues that this finding is clearly erroneous because there was no evidence the victim "had trouble with English." We agree that there is no evidence that the difficulty in understanding the victim of the car theft was the result of a language barrier. But whether the difficulty in understanding the victim came from a language barrier or other speech-related issues is immaterial. The record includes an officer's handwritten note indicating that the officer "couldn't understand a word [the victim] was saying." The judge was entitled to infer that the timing of the car theft was uncertain based on the record before him, including evidence that there may have been difficulty in understanding the victim.

[15] The stolen vehicle report states that the victim of the carjacking reported the crime to police at about 10:40 P.M. The report states that the car was last seen at 9:30 P.M. and discovered stolen at 10 P.M. on February 26, 1993. However, given that the victim of the carjacking was forced out of the car at gunpoint, the time the car was last seen and the time it was discovered stolen would have logically been the same. Moreover, the stolen vehicle report erroneously lists the "Date of Theft" as February 27, 1993, rather than the day prior.

would have been a real factor in the jury's deliberations" (citation omitted), Drayton I, 473 Mass. at 31, based on other details concerning Johnson, Woods, and the stolen Nissan. As the motion judge found, approximately two weeks after the shooting, Johnson and Woods were discovered in the stolen Nissan. The Nissan had reportedly been stolen by three men near the location of the shooting, on the same day of the shooting, and matched the general description at trial of the shooter's vehicle, which had also been occupied by three individuals.

Further, physical descriptions provided bases to potentially link both Johnson and the shooting victim to the Annunciation Road robbery on the day of the murder. At the time of his arrest, Johnson had a scar over his right eye, which was consistent with the injury police observed on the bleeding man who had been robbed on Annunciation Road. Additionally, the description of the perpetrator of the Annunciation Road robbery, which was committed several hours before the shooting, was consistent with that of the victim of the shooting.

The motion judge determined,

"These facts, coupled with the fact that Johnson had stolen and possessed the murder weapon, suggested a link between Johnson, the Annunciation Road robbery, and the shooting of [the victim]. This inferential link was strengthened by the trial testimony itself: (i) that the police reported that the victim of the shooting (Robinson) may have been, or may have been confused for (indeed, the police at least initially confused him for), the Annunciation Road robber; and (ii) the victims of the Annunciation Road robbery

refused to cooperate with the police[,] and one said[,] 'I'll take care of it myself.'"

In the absence of this link, the defendant was barred from introducing evidence that Johnson had stolen the murder weapon from his father prior to the murder and that he had it with him sometime in late February 1993. The newly discovered evidence would have provided a nonspeculative basis for the defendant's theories of a third-party culprit. The motion judge appropriately concluded, "Such information would have likely caused the court to admit the evidence about Johnson having possessed the murder weapon in late February."

Thus, given the foregoing, the motion judge did not abuse his discretion in finding that the newly discovered third-party culprit evidence casts real doubt on the justice of the defendant's convictions.

d. DNA evidence. Finally, we consider the Commonwealth's argument as to the newly available DNA evidence, which the motion judge found "was only discoverable with the aid of scientific techniques and data analysis tools developed long after [the] defendant's trial and after his second motion for a new trial." While determining that the DNA evidence would not have been sufficient to justify a new trial on its own, the motion judge nonetheless considered it to "marginally further

support[]" his conclusion that justice may not have been done. See Rosario, 477 Mass. at 77-78.

The Commonwealth argues that the motion judge erred by making factual findings regarding the DNA testing without holding an evidentiary hearing where the Commonwealth could have, through cross-examination and calling its own witnesses, challenged the defendant's factual assertions or their significance.

In adjudicating a motion for a new trial, "[t]he judge may rule on the issue or issues presented by such motion on the basis of the facts alleged in the affidavits without further hearing if no substantial issue is raised by the motion or affidavits." Mass. R. Crim. P. 30 (c) (3). "When a substantial issue has been raised, and supported by a substantial evidentiary showing, however, the judge should hold an evidentiary hearing" (quotations and citation omitted). Drayton I, 473 Mass. at 31. While rule 30 (c) "encourages the denial of a motion for a new trial on the papers, without hearing, where no substantial issue is raised[,] . . . [a] judge's power to grant such a motion on the papers is more circumscribed." Commonwealth v. Gordon, 82 Mass. App. Ct. 389, 394 (2012). That power may be exercised where "the substantial issue raised is solely a question of law, or if the facts are undisputed in the record." Id. at 395.

Here, the Commonwealth never requested live testimony on the DNA evidence. At a status conference on March 31, 2022, the judge and the parties explicitly discussed the scope of evidence that would be considered in the evidentiary hearing. The judge expressed that he was not inclined to hear live testimony on the DNA evidence, suggesting instead that he could rely "entirely on the papers," which included reports from the testing laboratories along with any expert affidavits submitted by the parties. Not only did the Commonwealth not object to this proposal, but it also assented to the submission of exhibits that included expert affidavits from both the defense and the Commonwealth on the DNA evidence.

"[A] claim is procedurally waived whenever a litigant fails to make a timely objection" (quotation and citation omitted). Commonwealth v. Robinson, 480 Mass. 146, 150 (2018), S.C., 493 Mass. 303 (2024). The Commonwealth -- having had an opportunity to object to the motion judge's decision not to hear live testimony on this issue but having failed to do so -- cannot now turn around and say that it was an abuse of discretion to make factual findings without hearing live testimony on the DNA evidence. See Commonwealth v. Mauricio, 477 Mass. 588, 594 (2017) (declining to address merits of issue where Commonwealth did not raise issue below and, thus, merits of issue were not

"meaningfully addressed" during motion hearing); Commonwealth v. Leslie, 477 Mass. 48, 58 (2017) (same).

3. Conclusion.  For the foregoing reasons, we hold that the motion judge did not commit a significant error of law or abuse his discretion in concluding that the newly discovered and newly available evidence casts real doubt on the justice of the defendant's convictions and that, therefore, the defendant is entitled to a new trial.  We affirm the order allowing the defendant's motion for a new trial and remand the matter to the Superior Court for a new trial if the Commonwealth chooses to pursue one.

So ordered.